**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEE MURPHY (R47189),** | ) | |
| **Petitioner,** | ) | **Case No. 12 C 3106** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **MICHAEL ATCHISON, Warden,** | ) | |
| **Menard Correctional Center,** | ) | |
| **Respondent.[1]** | ) | |

**MEMORANDUM OPINION AND ORDER**

On March 17, 2003, police responded to a 911 call placed by Choni Dade. Upon arrival

at Choni's home on the South Side of Chicago, they discovered Choni and her children,

five-year-old Dashay Barlow and two-year-old Jailan Carter, near death due to multiple stab and

gunshot wounds.[2] Choni was pronounced dead upon her arrival at the hospital, but her children

survived after receiving extensive medical treatment. Following a jury trial in the Circuit Court

of Cook County, Lee Murphy was found guilty of the first-degree murder of Choni and the

attempted murder of Dashay and Jailan. He was sentenced to a 75-year term of imprisonment

for the first-degree murder conviction and two 20-year terms of imprisonment for the attempted

murder convictions, to be served consecutively.

Murphy's *pro se* motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is

before the court. Murphy argues, among other things, that the evidence was insufficient to

---

[1] Murphy is incarcerated at the Menard Correctional Center. The current warden is Rick Harrington. Accordingly, Rick Harrington is hereby substituted as the respondent. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts; *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

[2] The Illinois Appellate Court and the respondent both refer to Choni Dade, Dashay Barlow, and Jailan Carter by their first names. To promote clarity, the court will do so as well.

support his conviction and that admission of Dashay's identifications of him in a line-up and in court violated his right to due process. For the following reasons, the petition is denied.

## I. BACKGROUND

The court begins by summarizing the facts and procedural posture. It will presume that the state court's factual determinations are correct for the purposes of habeas review as Murphy neither contests them nor points to clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). The following facts and procedural posture are drawn from the state court record (Dkt. 9) and the Illinois Appellate Court's opinions in Murphy's direct appeal, *People v. Murphy*, No. 1-05-3345 (Ill. App. Ct. Mar. 31, 2008) (unpublished order) (Dkt. 9-17, Page ID# 2379-2405), and collateral appeal, *People v. Murphy*, No. 1-09-2411 (Ill. App. Ct. May 2, 2008) (unpublished order) (Dkt. 9-18, Page ID# 2552-2560).

### A. Pretrial Motions

Prior to trial, Murphy sought to suppress evidence of a lineup identification by Dashay and to preclude her from identifying him in court. In support, Murphy asserted that Dashay's identification was unreliable because the lineup was conducted improperly and was unreasonably suggestive as he was the only person in the lineup whose photograph had been shown to Dashay and with whom she was familiar.[3] Based on its conclusion that Murphy failed to allege governmental misconduct and could not present an offer of proof showing governmental misconduct, the trial court denied the motion.

---

[3] Murphy does not claim that Dashay was only shown a photograph of him. Instead, He asserts that he was the only person who appeared in both a photographic array and a subsequent lineup.

The State filed a pretrial motion seeking to preclude Murphy from introducing evidence that one of its witnesses, Officer Robert Bartik, allegedly engaged in misconduct in a different case and had been named as a defendant in a civil action predicated on that alleged misconduct. In response, Murphy sought to introduce the testimony of Donny McGee, who had been charged with an unrelated murder. Specifically, Murphy sought to present evidence that during McGee's trial, Bartik testified that while he was preparing to administer a polygraph examination to McGee, McGee confessed to committing the murder. McGee denied confessing to Bartik, was acquitted, and subsequently brought a federal lawsuit against Bartik and the Chicago Police Department. The trial court granted the State's motion and barred Murphy from presenting this evidence to the jury.

**B.      Murphy's Trial**

The evidence adduced at trial established that Choni lived with her parents and her two children at 8014 South Troy Street in Chicago, Illinois. Approximately five years before the events at the heart of this case, Choni and Murphy attended high school together. At that time, Murphy lived with relatives at 8149 South Troy. Choni and Murphy were friends, and he visited her home on several occasions.

**1.      The Attack on Choni, Jailan, and Dashay**

At 10:50 a.m. on March 17, 2003, Choni called 911 and reported that someone was trying to kill her. Police officers responded and followed a trail of blood to Choni, who was lying on the floor of a room on the first floor of her home. Jailan and Dashay were found lying on a bed in a second-floor bedroom. Their throats had been cut, and there was blood on their clothing. All three victims were in such distress that they were unable to communicate effectively.

Upon her arrival at the hospital, Choni was pronounced dead. An autopsy revealed that she had been repeatedly stabbed and had suffered four gunshot wounds, one of which had been fired at close range. In addition, Choni had defensive injuries, consisting of multiple abrasions and knife wounds on the back of her left hand.

When two-year-old Jailan was admitted to the hospital, he had only one-half the expected amount of blood and had stab wounds on his neck and tongue. After surgery, he was admitted to the pediatric intensive care unit, was on life support until March 22, 2003, and was discharged on March 28, 2003. Five-year-old Dashay had stab wounds on her neck, left shoulder, and both wrists, as well as a gunshot wound that entered her mid-abdomen, traveled through her liver, hit the back of her tenth rib, and exited her midback. She underwent surgery and was admitted to the pediatric intensive care unit. She remained on a ventilator until March 19, 2003, and was discharged on March 25, 2003.

### 2. Dashay's Testimony

At trial, Dashay, who was then seven years old, described the attack on the morning of March 17, 2003. Dashay testified that she was watching the Disney channel on television with Jailan upstairs when the doorbell rang. She came downstairs and saw her mother with a man who was wearing a black "doo-rag" on his head. Dashay identified Murphy as the man she saw in her home and stated that he had visited their house before. Dashay saw Murphy and her mother in the kitchen. Murphy pushed her mother into the refrigerator and started beating her up. After Dashay returned upstairs with Jailan, Murphy shot her in the chest, stabbed her in the back, and stabbed Jailan. Murphy then left and the police came and took her to the hospital.

While Dashay was hospitalized, a woman showed her some pictures. She picked out the picture of the man who hurt her, her mother, and Jailan. Dashay also testified that she subsequently went to the police station and looked at "a room full of men." She saw the man who had hurt her — Murphy — and pointed him out to the police. She also identified Murphy in court. On cross-examination, Dashay acknowledged she initially told the woman at the hospital that she could not identify the intruder because that person was wearing a mask. She testified, however, that Murphy was not wearing a mask on the day of the attacks and that she could see Murphy's face when her mother opened the door. She further stated that her grandparents did not tell her what to say at trial and the police did not tell her that the person who attacked her would be at the police station.

### 3. Christine Escobar's Testimony

Christine Escobar was a forensic services manager at the Chicago Children's Advocacy Center. She was trained to interview children and by the time she met Dashay, she had interviewed more than 1,600 children. On March 19, 2003, police detectives asked Escobar to interview Dashay, who was in the pediatric intensive care unit of Advocate Hope Children's Hospital. Escobar stated that she spoke with Dr. Jaimovich, who explained that Dashay could talk but was on medication and was in and out of consciousness. According to Escobar, Dashay was very groggy during the initial interview and could not provide any details about the events of March 17, 2003.

Escolar interviewed Darshay a second time about 90 minutes later. Dashay was still very groggy and her description of events "jumped around." Dashay initially said she saw a single man wearing a mask in her home on the day of the attack. She later said there were three men

wearing masks. When Escobar returned an hour later, Dashay repeated that there were three men with masks. Escobar stated that she told Dashay's grandparents not to ask their granddaughter any questions about what happened.

According to Escobar, Dashay seemed less groggy when she returned on March 20, 2003. When asked what had happened on March 17th, Dashay said that her mother let a man into her house. Dashay told Escobar that she heard her mother say the man's name, but did not know what the name was, and did not see the man's face. Escobar returned to the hospital on March 21, 2003. Dashay seemed a little more alert and stated that one man had come to the house and that her mother knew him and let him in. Dashay further stated that the man had a "black thing" on his head. She then said that the man "got" her, Jailan, and her mother before the police came.

Escobar interviewed Dashay again on March 25, 2003. Dashay repeated that the man who came to the house was wearing a "black thing" covering the top of his head. She also reiterated that her mother knew him and stated that he had been at the house before, and that he "got" her, her mother, and Jailan. In addition, Dashay said that the man had a gun.

Escobar returned to the hospital later that afternoon with eight photographs provided by the police. Some of the photographs depicted male members of Dashay's family, but Escobar did not know the identities of any of the men in the pictures. She showed the photographs to Dashay one at a time. When she got to Murphy's photograph, Dashay recoiled, did not want to look at the picture, and put her head against her grandmother's chest. Escobar testified that she had shown pictures to children often, and "this was probably the strongest reaction [she] ever had from a child." Dashay did not react to any of the other photographs.

After taking a break, Escobar showed Dashay the photographs a second time, but withheld Murphy's photograph. She asked Dashay if any of the men scared her, and Dashay responded, "no." Escobar then showed Murphy's photograph and three other randomly chosen photographs to Dashay. Dashay pointed to Murphy's photograph and said that he frightened her. Dashay then began to cry and went into her grandmother's arms. Dashay said, "[h]e did that to me, Jailan, and my mommy."

The next day, Escobar returned to the hospital and interviewed Dashay again. She showed Dashay five photographs individually but withheld Murphy's photograph. Dashay did not recognize the men but told Escolar that the picture she saw yesterday scared her and that the man from yesterday's picture had "done it" to her, her brother, and her mother. She said that her mother had been hurt first, then her brother, and "then he got me."

### 4. Dr. David Jaimovich's Testimony

Dr. David Jaimovich, the chief of pediatric intensive care at Advocate Hope Children's Hospital, was one of the physicians who treated Dashay. While in the intensive care unit, Dashay was placed on life support and received fentanyl (a powerful pain medication) and benzodiazepine (a hypnotic or amnesic drug). In the early morning hours of March 19, 2003, she was taken off life support and was again given pain medication. Dashay received chloral hydrate (a sedative) at 2:30 a.m. She also received benadryl (an antihistamine that helps with sedation in children) and several doses of morphine throughout the day. Dr. Jaimovich testified that fentanyl and chloral hydrate can have residual effects lasting for 12 to 24 hours. He opined that the residual effects of these drugs could have affected Dashay's ability to recall and relate events on March 19th and March 20th.

### 5.     Charmaine Dade's Testimony

Charmaine Dade, Choni's mother, testified that on March 16, 2003, at about 10:30 or 11 p.m., Murphy came to the house and stayed for approximately 10 minutes. Mrs. Dade and her husband left for work at 6:30 a.m. the following day. She telephoned her daughter several times that morning, but could not reach her. She returned home at mid-day and discovered that Choni had been murdered and her grandchildren were hospitalized. After Dashay and Jailan were discharged from the hospital, they continued to live with Mrs. Dade and her husband. Mr. and Mrs. Dade testified that they did not question either Dashay or Jailan about the attack.

Mrs. Dade further testified that on June 1, 2003, Dashay watched a videotape of a memorial service for Choni. Afterwards, Dashay said that she remembered "the bad persons's name." When the prosecutor questioned Mrs. Dade about that conversation, defense counsel immediately objected, and the objection was sustained. The prosecutor then inquired whether the person that Dashay had named was in court, and defense counsel's objection was sustained. Murphy moved for a mistrial, contending that the State had improperly attempted to elicit hearsay evidence of the attacker's identity through the testimony of Mrs. Dade. The trial court denied the motion since Murphy's objections were sustained and Dashay's statement to her grandmother was not admitted.

### 6.     Detective Daniel McNally's Testimony

Detective Daniel McNally testified that he and Detective Joseph Frugoli were assigned to investigate the shooting at 8014 South Troy. McNally interviewed Murphy at the police station on March 18, 2003. Murphy acknowledged that he had known Choni for several years and had been to her house on the evening of March 16, 2003. According to Murphy, he talked to Choni

for about 10 minutes, and she invited him to return the next day to help plan a birthday party for Jailan.

McNally testified that Murphy told him that he woke up at 7 a.m. on March 17, 2003, took his wife, Anita Campbell, to work and returned home at 8:30 a.m. Murphy showered, watched some television, and drove to the house of his friend, Raymond Wade, who lived at 7146 South Carpenter. Murphy arrived at Wade's house at 10:30 or 11 a.m., and stayed for about 30 minutes. The two men spent about two hours looking for homes before returning to Wade's house. Murphy then drove Wade's mother to work, returned to Wade's house, went out again at the end of the afternoon to pick his wife up from work, and returned to his home.

McNally testified that on June 4, 2003, he told Murphy he was under arrest for the murder of Choni and for the attempted murder of her children and that Dashay had identified him. Murphy denied any involvement, repeated his earlier account, and agreed to take a polygraph examination on the following day. The next morning, McNally told Murphy that he had interviewed Raymond Wade. In response, Murphy stated that he believed his wife had murdered Choni and attempted to murder her children. McNally then took Murphy for his polygraph examination.

### 7. Officer Robert Bartik's Testimony

Officer Robert Bartik is a polygraph examiner with the Chicago Police Department. On June 5, 2003, Bartik spoke to the detectives about the case and then went to the polygraph room to test Murphy. Before doing so, he advised Murphy of his *Miranda* rights and gave him a polygraph consent form. When asked to sign the form, Murphy said that he did not think he was going to take the test. Bartik testified that he told Murphy that one of the children had identified

him from a photo array, and asked Murphy if he was going to have a problem with the test. According to Bartik, Murphy responded by saying he did not think he would be able to pass the test.

Bartik then asked Murphy to tell him what happened. Bartik testified that Murphy told him that he went to Choni's house on March 17, 2003, to talk about her son's birthday. Murphy and Choni argued. Choni had a knife, and the children were hanging on him. The children were stabbed as Murphy pushed them away. Murphy and Choni struggled over the knife, and Murphy pulled out a handgun and shot Choni several times. He then cut her throat and also cut the children's throats. Bartik testified that, following this statement, he summoned Detective Frugoli.

### 8. Detective Joseph Frugoli's Testimony

Detective Joseph Frugoli went to the polygraph examination area in response to Bartik's call. Frugoli advised Murphy of his rights, and Murphy said he wanted to tell the truth. He then admitted that he was at Choni's house on March 17, 2003. Choni saw a ring on his hand and asked if he was getting married. When he said yes, Choni became upset, grabbed a knife, and attacked him. Murphy slapped the knife out of her hand, but she retrieved it and came back at him. As they struggled, Murphy pulled out a gun and shot her. Frugoli testified that Murphy stated that he and Choni were responsible for the children's injuries because knives were swinging while the children were nearby.

### 9. Assistant State's Attorney Caren Armbrust and Detective McNally's Testimony

Based on Murphy's statements, the detectives contacted the Felony Review Unit of the Cook County State's Attorney's Office. Assistant State's Attorney Caren Armbrust testified that she spoke with McNally and reviewed police reports before speaking with Murphy. After she explained who she was and advised him of his *Miranda* rights, Murphy agreed to speak with her. Murphy stated that he went to Choni's house at about 10:50 a.m. on March 17, 2003. Choni became very upset when she saw that he was wearing a wedding band.

He and Choni started shoving each other while they were in the kitchen. Choni grabbed a knife, but Murphy grabbed it from her and slashed her in the neck. He also stated that he must have slashed the two children during the struggle. He then admitted that he shot Choni, but he denied going upstairs to the second floor. Armbrust testified that Murphy told her that Dashay must have been shot when he was shooting at Choni.

Detective McNally was present when Murphy gave his statement to Armbrust. According to McNally, Murphy also stated that he told his wife, Anita Campbell, about the incident. McNally interviewed Campbell, who was in the police station, and then brought her to Murphy. While Murphy and Campbell were in the same room, McNally told Murphy that Campbell had denied any knowledge of Murphy's involvement. McNally testified that Murphy then told Campbell, "Baby, I did it, I told them I did it, I told you I did it, now you tell them I did it."

McNally also testified that at 10:35 p.m. on June 5, 2003, Murphy participated in a lineup and chose the far right position. Dashay and her grandparents came into the viewing room. Dashay looked to the right towards Murphy, who was wearing a green shirt, and became upset.

McNally testified that when asked whether she saw anybody who had hurt her, her brother and her mother, she pointed at Murphy and said "green shirt."

Armbrust then re-interviewed Murphy. She testified that Murphy again told her that he and Choni had argued about his engagement. Murphy shoved Choni against the kitchen counter as she grabbed a knife. As they struggled, Murphy took the knife, slashed Choni's throat, and slashed her daughter. He then shot Choni and Dashay, who was on the stairs, shot Choni again while she was on the telephone, and slashed Choni's son. Murphy left the house and gave the gun to a person named "Jemel." Armbrust wrote a summary of this statement in her felony review folder.

### 10.     Evidence From the Scene

The police recovered two bloody kitchen knives, five .38 caliber cartridge casings, and two bullets from Choni's home. Two bullets found in Choni's body and the two bullets recovered from the scene were fired from the same .38 caliber weapon, as were the five cartridge casings. Five latent fingerprint impressions taken from the scene were compared to fingerprint samples from Choni and Murphy. Three latent prints matched Choni's sample. Two latent palm prints taken from the second-floor bathroom could not be identified, and no palm-print sample was provided for Choni.

DNA analysis established that Dashay's and Jailan's blood was on knives discovered in the house. In addition, swabs taken from Choni's fingernail clippings and from her vaginal and rectal cavities revealed a DNA profile, but the donor of that profile could not be identified. Antonio Thomas testified that he was an acquaintance of Choni and that he had sexual intercourse with her on March 15, 2003, two days before her death.

**11.     The Defense Case**

After the State rested, Murphy called attorney Richard Kling.  Kling testified that he went to the police station on June 6, 2003.  He asked a detective if Murphy had made any statements and was told that he had not.  Kling spoke with Murphy and told the detective that he did not want his client questioned.

Murphy then testified that for about a year prior to his arrest, he lived at 710 North Kolin Avenue with his fiancée, Anita Campbell, and his stepson.  Before that, he lived at 8149 South Troy with his mother and stepfather.  Murphy met Choni in high school, and he went on a double date with her twice, including a date on New Year's Eve of 2001.  Murphy had been to Choni's house 20 to 30 times, and they never had an argument.

On March 16, 2003, Murphy visited Choni's house at about 9:30 or 10 p.m.  Choni's father asked him to take off his hat, revealing a black "doo rag" underneath.  According to Murphy, he left the house after Choni invited him to her son's birthday party the next day.  He never saw Choni again, and learned the following day that she had died.

Murphy denied telling the police detectives that he was responsible for Choni's death.  He acknowledged that he had agreed to take a polygraph examination, but stated that Bartik neither asked him to sign a consent form nor questioned him.  After he was brought back to the police station, the detectives questioned him further, but he did not admit that he knew what happened to Choni.

Murphy then testified that he spoke with a female assistant state's attorney on June 5, 2003.  She advised him of his *Miranda* rights and asked if he had something to talk to her about.  Murphy responded, "no."  When she saw him a few hours later, she said that the detectives told

her he had confessed. Murphy told her that he did not know anything and did not want to speak with her. The next morning, Mr. Kling arrived to represent him.

Murphy denied that he was in the Dade house on March 17, 2003, or harmed Choni or her children. He also denied making any admissions to the police or to the assistant state's attorney about Choni and her children. Murphy acknowledged that he told the detectives that he had been with Raymond Wade on March 17, 2003, but denied telling them that Anita Campbell shot and stabbed Choni.

### 11.    The Rebuttal Case

In rebuttal, Prentella Patterson, Choni's close friend, testified that she hosted a fundraiser at a banquet hall in Chicago on New Year's Eve 2001. According to Patterson, Choni attended the fundraiser alone, and Murphy was not there.

### 12.    The Jury's Deliberations

During their deliberations, the jury sent the trial judge a note requesting to see the general progress reports from Bartik, Frugoli, and McNally on June 4 and June 5, 2003, as well as Armbrust's reports. The trial judge responded by advising the jury that these materials had not been admitted into evidence and that the jury had everything they needed to reach a verdict.

## B.    Murphy's Direct Appeal

Murphy appealed, arguing: (1) the evidence was insufficient to convict him beyond a reasonable doubt; (2) the trial court erred when it barred Donny McGee from testifying that Officer Bartik had falsified evidence in McGee's case; (3) the trial court erred when it refused to hold a hearing on his motion to suppress Dashay's identification because his counsel could not make an offer of proof regarding alleged police misconduct; (4) to the extent he was required to

support his claim of police misconduct in connection with Dashay's identification, his trial counsel provided ineffective assistance because counsel failed to do so; (5) the trial court erred when it denied his motion for mistrial after the State allegedly elicited hearsay testimony from Charmaine Dade, Choni's mother, regarding Dashay's statement about the name of the attacker; and (6) the trial court's response to the jury's request to see police reports that were not in evidence was improper.  Dkt. 9-16, Ex. P.  On March 31, 2008, the Illinois Appellate Court affirmed.

Murphy filed a petition for leave to appeal ("PLA") with the Illinois Supreme Court repeating three of the arguments presented to the Illinois Appellate Court (sufficiency of the evidence, the motion to suppress Dashay's identification, and Charmaine Dade's alleged hearsay testimony).  Dkt. 9-18, Ex. W.   The Illinois Supreme Court denied the PLA on September 24, 2008.  Murphy does not appear to have filed a petition for a writ of certiorari with the United States Supreme Court.

**C.     Murphy's State Post-Conviction Appeal**

On June 8, 2009, Murphy filed a *pro se* state post-conviction petition pursuant to Illinois' Post-Conviction Hearing Act, 725 Ill. Comp. Stat. § 5/122-1, *et seq.*, alleging:

1.      Trial counsel was ineffective for:

      a.      failing to investigate, interview, and call witnesses;

      b.      failing to present rebuttal evidence;

      c.      adopting an "all or nothing" approach;

      d.      inadequately presenting a motion to suppress identification;

      e.      proceeding with a falsified confession; and

       f.       inadequately presenting a motion for mistrial regarding the handling of the effort to elicit hearsay testimony from Charmaine Dade;

2.       The trial court used the wrong standard when ruling on his motion to suppress identification;

3.       The trial court's handling of the jury's request for police reports was prejudicial; and

4.       His constitutional rights were violated when a new judge replaced the original judge two months before trial.

*People v. Murphy*, No. 03 CR 14910 (Cir. Ct. Cook Cnty. Aug. 11, 2009) (unpublished order), Dkt. 9-15, Ex. O at C44-63. The Circuit Court of Cook County dismissed the petition as frivolous and patently without merit.

Murphy appealed, arguing that his trial counsel was ineffective for failing to investigate, interview, and call alibi witnesses Brenda Evans, Raymond Wade, Anita Campbell, Darlene Edwards, and Teair Butler. Specifically, he contended that because his main defense theory was that Dashay's identification was unreliable, his counsel should have presented an alibi defense. Dkt. 9-18, Ex. Y. On May 2, 2011, the Illinois Appellate Court noted that the petition lacked sufficient detail and was not supported by affidavits but also rejected the ineffective assistance of counsel claims about alibi witnesses on the merits. It then affirmed the dismissal of Murphy's post-conviction petition. Dkt. 9-18, Ex. BB.

Murphy filed a PLA with the Illinois Supreme Court arguing: (1) the lower courts erred when they held that under the Illinois Post-Conviction Hearing Act, a petitioner alleging that trial counsel was ineffective for failing to call witnesses at trial must attach affidavits from the witnesses to his petition; and (2) the summary dismissal of his post-conviction petition violated Illinois law because it was premised on the erroneous assumption that a *pro se* petitioner had to

detail the testimony of potential additional witnesses in his post-conviction petition. Dkt. 9-18, Ex. EE. The Illinois Supreme Court denied the PLA on September 28, 2011. Murphy does not appear to have filed a petition for a writ of certiorari with the United States Supreme Court.

**D.    Murphy's Federal § 2254 Petition**

Murphy's § 2254 petition, which was received by the court on April 26, 2012, was dated April 4, 2012. The court will not consider any possible statute of limitations issues as the respondent's answer does not challenge the timeliness of Murphy's petition. Thus, the respondent has waived the ability to argue this point. *See Grigsby v. Cotton*, 456 F.3d 727, 731 (7th Cir. 2006). In his petition, Murphy argues:[4]

1.    The evidence was insufficient to convict him beyond a reasonable doubt (Claim A);

2.    The trial court's order barring Donny McGee from testifying that Officer Bartik falsified evidence in McGee's case violated his right to due process (Claim B);

3.    The admission of Dashay's line-up and in-court identifications violated his right to due process (Claim C);

4.    The trial court's denial of his motion for a mistrial based on the State's attempt to have Charmaine Dade testify that Dashay stated that she remembered that her attacker's name was Lee violated his right to confront witnesses and his right to due process (Claim D);

5.    The trial court's refusal to allow the jury to see police reports during deliberations violated his right to due process (Claim E);

6.    Trial counsel provided constitutionally ineffective assistance because he:

   a.    Failed to contend that the lineup was suggestive as part of Murphy's motion to suppress Dashay's identification (Claim F1);

---

[4] To promote clarity, the court has used the respondent's numbering system for Murphy's claims. The court notes that this numbering system does not track the organization used by Murphy in his lengthy § 2254 petition. *See* Murphy's § 2254 Petition, Dkt. 1.

b. Failed to investigate or call witnesses Brenda Evans, Raymond Wade, Anita Campbell, Darlene Edwards, and Teair Butler to provide alibi testimony (Claim F2); and

c. Failed to pursue an alibi defense based on Murphy's confession (Claim F3);[5] and

7. The trial court erred when it rejected his claims about the alibi witnesses based on his failure to submit affidavits summarizing their testimony in support of his state post-conviction petition and, construing Murphy's *pro se* petition broadly, trial counsel was ineffective for not providing affidavits (Claim G).[6]

## II. DISCUSSION

As discussed below, Murphy did not default Claims A (sufficiency of the evidence) and C (admission of Dashay's line-up and in-court identifications), but these claims fail on the merits. With respect to Murphy's remaining arguments, multiple procedural doctrines limit a federal court's power to reach the merits of claims raised in habeas petitions filed pursuant to 28 U.S.C. § 2254. For the following reasons, based on these doctrines, Murphy is not entitled to habeas relief as: (1) Claims B (Donny McGee's testimony about Officer Bartik), E (police reports during jury deliberations), F1 (ineffective assistance of trial counsel – motion to suppress Dashay's identification), F2 (ineffective assistance of trial counsel – failure to present testimony of alibi witnesses), F3 (ineffective assistance of trial counsel – failure to present alibi defense based on Murphy's confession), and G (failure to submit affidavits detailing testimony of alibi

---

[5] Murphy appears to be arguing that the timeline of events outlined in his confession demonstrates his innocence. *See* Dkt. 1 at PageID# 23-24, 30. The respondent did not include this claim in its answer. The court will address it and has numbered it following the respondent's claim numbering system.

[6] The affidavit claim, Dkt. 1 at PageID# 27, also does not appear in the respondent's answer. As with the alibi claim, the court will address it and has numbered it following the respondent's claim numbering system.

witnesses) are barred by the doctrine of procedural default because Murphy did not present them in one full round of state court proceedings; (2) Claim D (the State's questions to Charmaine Dade about Dashay's identification of her attacker) is barred by the doctrine of full and fair presentment or, alternatively, fails on the merits; and (3) none of the exceptions to procedural default are applicable.

## A.    The Merits – Sufficiency of the Evidence (Claim A) and Due Process Based on Dashay's Identification (Claim C)

### 1.    Standard of Review

A habeas petitioner is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 if the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).  A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."  *See Williams*, 529 U.S. at 405.

With respect to the "unreasonable application" prong of § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case.  *See id.* at 407.  A state court's application of Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011) ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable").

## 2.     Sufficiency of the Evidence (Claim A)

Murphy contends that the evidence presented at trial was insufficient to convict him of the murder of Choni and the attempted murders of Dashay and Jailan (Claim A). Specifically, he takes issue with the evidence presented about his confession and Dashay's identification of him as the attacker. The Illinois Appellate Court held that:

> When a defendant challenges the sufficiency of the evidence, the appellate court must determine: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); People v. Collins, 214 Ill.2d 206, 217, 824 N.E.2d 262 (2005). It is not the role of the reviewing court to retry the defendant, and a conviction will not be set aside unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt . . . . The determination of the weight to be given the witnesses' testimony, their credibility, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact.

Dkt. 9-17 at PageID # 2394 (Ex. T at 16).

The Illinois Appellate Court rejected Murphy's sufficiency of the evidence claim, explaining:

> In this case, Dashay testified at trial and positively identified [Murphy] in court as the attacker. In addition, the prosecution presented evidence that Dashay had identified [Murphy]'s photograph shortly after the attack and identified him in a lineup several weeks later. Although Dashay initially told Escobar that there was one man in a mask and later said there were three men in masks, the jury also heard the testimony of Dr. Jaimovich, who explained that the medications administered to Dashay between March 17th and the 20th could have affected her ability to recall and relate events. After the effects of her medications wore off, Dashay identified [Murphy] from a photo array on March 25, 2003, and from that date on, she never wavered in her identification of [Murphy] as the person who had attacked her, her brother, and her mother.

> The prosecution also presented the testimony of McNally, Frugoli, Bartik, and Armbrust, who all stated that [Murphy] had made verbal statements in which he admitted his involvement in the incident that led to the murder of Choni and to the

injuries inflicted on Dashay and Jailan.  In particular, [Murphy] admitted in those statements that he was present at Choni's house on the day of the murder and that they became engaged in a physical altercation involving the use of knives and a gun.  Although not formally memorialized in audio, video, or written statements, [Murphy]'s statements were summarized in notes and general progress reports prepared by the police detectives and by the assistant state's attorney.

Although [Murphy] denied making these verbal statements and denied any involvement in the attack, it was the prerogative of the jury to decide the credibility of the witnesses and to resolve any inconsistencies and conflicts in the evidence.  The lack of a murder weapon and other physical evidence, such as matching fingerprints or DNA, does not mandate reversal of [Murphy]'s convictions.  The jury was well aware of the alleged deficiencies in the evidence cited by [Murphy] on appeal.  As the finder of fact, the jury was entitled to credit the testimony of the prosecution witnesses and to disregard [Murphy]'s denial and alibi evidence.  In reviewing all of the evidence in accord with the standard set forth above, we find that a rational trier of fact could have found [Murphy]'s guilt beyond a reasonable doubt.  Accordingly, we reject [Murphy]'s assertion that the State failed to prove him guilty beyond a reasonable doubt.

Dkt. 9-17 at PageID# 2395-96 (Ex. T at 17-18) (internal citations omitted).

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), governs Murphy's sufficiency of the evidence claim.  In its opinion, the Illinois Appellate Court expressly relied on *Jackson* and correctly identified the standard announced in that case.  The state court's decision is thus not "contrary to" clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d)(1); *see also Hardy v. Cross*, — U.S. —, 132 S. Ct. 490, 494 (2011) (when a state court identifies the correct Supreme Court standard, its decision is not "contrary to" clearly established federal law); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) (a "decision applying the correct legal rule to the facts of a case is not 'contrary to' within the meaning of §2254(d)(1).").

The court thus turns to whether the decision was "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C.

§ 2254(d)(1). Murphy asserts that the jury should have accepted the defense's version of events and rejected the prosecution's evidence. However, "[f]ederal courts are in no position to redetermine the credibility of witnesses observed by state trial courts." *Kines v. Godinez*, 7 F.3d 674, 678 (7th Cir. 1993); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (a federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Thus, credible testimony from a single witness is enough to support a conviction. *U.S. ex rel. Wandick v. Chrans*, 869 F.2d 1084, 1089 (7th Cir. 1989); *see also United States v. Payton*, 328 F.3d 910, 911 (7th Cir. 2003) (rejecting sufficiency challenge based on trial testimony of single witness); *Kines*, 7 F.3d at 678 ("[A] single witness can suffice to prove guilt beyond a reasonable doubt.").

As the Illinois Appellate Court noted, Dashay testified at trial and identified Murphy as the attacker. In addition, although Dashay initially told Escobar she had seen a single man in a mask and later said she saw three men in masks, Dr. Jaimovich testified that sedative and pain medications Dashay received between March 17, 2003, and March 20, 2003, while she was in intensive care due to extensive, severe injuries, could have affected her ability to recall and relate events. After the effects of her medications wore off, Dashay identified Murphy from a photo array on March 25, 2003, and from that date on, consistently identified him as the attacker. She also identified a photograph of Murphy shortly after the attack and identified him in a lineup several weeks later.

Moreover, under *Jackson*, this court cannot accept Murphy's invitation to disregard the testimony of the witnesses who testified about his confession. When evaluating Murphy's sufficiency of the evidence claim, the court must consider "whether, after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Detective Daniel McNally, Officer Robert Bartik, Detective Joseph Frugoli, and Assistant State's Attorney Caren Armbrust all testified that Murphy confessed. In sum, according to these witnesses, Murphy admitted he was at Choni's home on the day of her murder. An argument about Murphy's engagement escalated into an altercation in the kitchen involving knives and a gun. Although Murphy denied going upstairs, he stated that the children were stabbed because they were hanging on their mother during the fight, and surmised that Dashay must have been shot when he was forced to shoot at Choni after she tried to stab him.

Pursuant to controlling Supreme Court precedent, the court must view the evidence about Murphy's confession, along with Dashay's identification testimony, in the light most favorable to the State. *See id.* When viewed through this lens, it is clear that a rational jury could have found the essential elements of murder and attempted murder beyond a reasonable doubt. Accordingly, the state courts reasonably applied clearly established Supreme Court precedent to the facts when they rejected Murphy's sufficiency of the evidence claim. *See* 28 U.S.C. § 2254(d)(1). Murphy's request for habeas relief with respect to this claim is, therefore, denied.

### 3. Due Process – Dashay's Identification (Claim C)

Before the state courts, Murphy contended that the trial court's denial of his motion to suppress Dashay's lineup and in-court identifications without an evidentiary hearing violated his right to due process under the Fourteenth Amendment (Claim C). Dkt. 9-16, PageID# 2158 (Ex. P at 28). In his § 2254 petition, he challenges the trial court's refusal to hold an evidentiary

hearing about Dashay's out-of-court identification unless he first presented an offer of proof with evidence indicating the police acted improperly. He also argues that his right to due process was violated by Dashay's in-court identification. The court begins by considering the out-of-court identification, as Murphy's claim that the in-court identification was improper is premised on his contention that it was tainted by the improper out-of-court identification.

### a. The Applicable Supreme Court Standard for Evaluating Whether an Identification is Unduly Suggestive

A defendant does not have an automatic right to "a judicial determination as to the admissibility of identification evidence outside the presence of the jury in every case." *United States v. Torres*, 191 F.3d 799, 811 (7th Cir. 1999) (citing *Watkins v. Sowders*, 449 U.S. 341, 349 (1981)). Nevertheless, eyewitness identification testimony can violate the right to due process when it creates a "substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (internal quotations omitted). To determine if an identification procedure is unconstitutional, the court must undertake a two-step analysis. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). "First, the defendant must establish that the identification procedure was unduly suggestive. If the defendant establishes this factor, [the court] then must determine whether, under the totality of the circumstances, the identification was nonetheless reliable." *Id.* (citations omitted). To assess the totality of the circumstances, the court must consider: "(1) the opportunity of the witness to view the [defendant] at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the [defendant]; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

### b. Were the State Courts' Rulings "Contrary To" Clearly Established Federal Law?

In Murphy's direct appeal, the Illinois Appellate Court held that "[a] defendant has a right to a fair and impartial hearing to determine whether an eyewitness's identification was the product of unnecessarily suggestive police procedures or other extraneous factors which may have unduly affected the judgment of the witness." Dkt. 9-17 at PageID# 2396 (Ex. T at 18). It then stated, based on state law, that "[i]t is the defendant's burden to establish that, based upon the totality of the circumstances, the pretrial identification was unduly suggestive." *Id.* at PageID# 2397 (Ex. T at 19). In addition, at trial, Murphy's counsel acknowledged that when considering the identification issue, the relevant factors are "the opportunity the victim had to view the accused at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the accused, the level of certainty demonstrated by the victim at the identification confrontation, and the length of time between the crime and the identification confrontation." Dkt. 9-3, PageID# 493, (Ex. C at U-7).

The Illinois Appellate Court's summary of the applicable rule tracks the federal standard, as announced by the United States Supreme Court. Moreover, as defense counsel recognized, the trial court was aware of the appropriate factors to consider to determine if the procedures employed during Dashay's identifications of Murphy were unduly suggestive. Thus, the state courts' decisions were not "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (if "neither the reasoning nor the result of the state-court decision contradicts" federal law, its decision satisfies § 2254(d)(1) despite a lack of citation to or awareness of federal precedent); *Oswald v. Betrand*, 374 F.3d 475, 477 (7th Cir. 2004) (where a

state appellate court rules on the merits of an argument raised by the petitioner but does not discuss the claim with reference to federal law, it is irrelevant as long as the standard applied by the state court is as demanding as the federal standard).

### c. Were the State Courts' Rulings an "Unreasonable Application of" Clearly Established Federal Law?

Next, the court considers whether the state courts' refusal to allow Murphy to proceed with an evidentiary hearing to challenge Dashay's identification and their rejection of Murphy's objections to Dashay's in-court identification were "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In resolving the evidentiary hearing issue, the Illinois Appellate Court noted that "Illinois courts have found no abuse of discretion in denying an evidentiary hearing on a motion to suppress evidence when the defendant's motion failed to state with particularity the circumstance or deficiency that resulted in a violation of his rights and where the defendant failed to present an offer of proof regarding the evidence that would support the allegations in the motion." *Id.* It then rejected Murphy's due process identification claim, explaining:

> Here, in deciding whether to conduct an evidentiary hearing, the trial court considered the allegations contained in the amended motion to suppress and the extensive arguments of the defendant's attorney. The defendant's motion did not allege with particularity any facts indicating that Dashay's pretrial identification of the defendant was the product of unnecessarily suggestive police procedures or other extraneous factors, such as influence by her grandparents, which may have unduly affected her judgment. In addition, defense counsel conceded that he was unable to present an offer of proof to justify an evidentiary hearing.

> In support of his contention that the court erred in striking his motion without conducting an evidentiary hearing, the defendant cites the following circumstances: (1) Dashay initially told Escobar that there were three perpetrators who were wearing masks, (2) Dashay changed her description of the attack several times, (3) Dashay identified the defendant in the lineup after he has been arrested, without counsel present, and (4) he was the only person in the lineup

whose photograph had been shown to Dashay and with whom she was familiar. Upon review of the entire record, we find that these circumstances are insufficient to warrant an evidentiary hearing.

With regard to the first two circumstances, Dashay's initial confusion as to the number of perpetrators and whether they were wearing masks was explained by Dr. Jaimovich, who testified that the medications administered to Dashay between March 17th and March 20th could have affected her ability to recall and relate events. As previously noted, Dashay identified the defendant from a photo array on March 25, 2003, after the effects of her medication had dissipated, and from that point, she never wavered in her identification of the defendant as the person who had attacked her, her brother, and her mother.

The third circumstance cited by the defendant has absolutely no bearing on whether Dashay was subjected to improper influence. There is no indication that Dashay was aware that the defendant had been arrested when she identified him in the lineup, and she testified at trial that the police did not tell her that the "guy" who attacked her was going to be at the police station. Moreover, the defendant did not have a right to have counsel present during the pre-indictment lineup because adversary criminal proceedings had not yet been initiated.

Finally, the defendant points to the fact that he was the only person in the lineup whose picture had been shown to Dashay and with whom she was familiar. The fact that Dashay ha[d] previously identified the defendant from a photo array did not render the lineup improperly suggestive. Also, the fact that Dashay recognized the defendant as an acquaintance of her mother's and as someone who had been to their home in the past was not a matter within the control of the police conducting the lineup. The defendant has not explained how the police could have avoided this circumstance or how it might have improperly influenced Dashay's identification.

Furthermore, Dashay testified and identified the defendant at trial, and the defendant does not claim on appeal that the trial court unduly limited his cross-examination of her. Dashay specifically denied that her identification of the defendant had been influenced by the police or her grandparents, and both Mr. and Mrs. Dade testified that they did not discuss the details of the attack with Dashay. Nothing in Dashay's testimony or that of her grandparents indicates that her identification was the product of unnecessarily suggestive police procedures or other extraneous factors that may have unduly affected her judgment. Consequently, the trial court did not abuse its discretion in denying the motion without an evidentiary hearing.

*Id*. at PageID# 2397-2400 (Ex. T at 19-22) (internal citations omitted).

The state courts' conclusions about the hearing and Dashay's identification are reasonable. Murphy's argument about suggestiveness was premised on the fact that Dashay first identified him by name after she had been living with her grandparents for a month. Dkt. 9-3 at PageID# 470-76 (Ex. C at R8-14). Specifically, when arguing that the identification should be suppressed, Murphy's counsel asserted that the social worker "plant[ed] . . . information into the mind of [Dashay]" by showing her photographs while she was in the hospital and that Dashay's grandparents must have subsequently coached her because she did not identify Murphy by name until after she had been living with her grandparents for a month. Dkt. 9-3, PageID# 491 (Ex. C at U5). This argument is consistent with Murphy's § 2254 petition, as he contends that the state court should have suppressed Dashay's out-of-court identification because she provided inconsistent information about her attacker and could not immediately identify him by name, even though she had previously met him. Dkt. 1 at PageID# 16.

The emphasis on the fact that Dashay did not initially identify Murphy by name is a red herring because a victim need not identify a defendant by name during a lineup, even when she knows him. Instead, the relevant first inquiry is whether the procedures used during the lineup are proper. *See Phillips v. Allen*, 743 F. Supp. 2d 931, 944 (N.D. Ill. 2010) (rejecting claim that an identification following a photo lineup was improper because the victim knew the defendant when "there is no evidence in the record that suggests [the victim] was confused about her task — she was being shown the photo lineup in order to pick her assailant, not to identify all the faces she may have recognized.").

Moreover, the trial court was not required to ignore the fact that during her first interactions with Escobar, Dashay was heavily medicated due to severe injuries that placed her

in intensive care.  In addition, although repeatedly showing a witness a photograph of the same person may increase the risk of misidentification, unless the identification procedure makes one suspect stand out from the others, "there is nothing per se unconstitutional about showing witnesses the photograph of a particular suspect multiple times as part of an array." *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (citing *Simmons v. United States*, 390 U.S. 377, 383-85 (1968)).

Finally, the trial court correctly observed that to the extent Murphy alleged any impropriety occurred, it was due to alleged coaching by Dashay's grandparents.  It is undisputed that the grandparents are private citizens.  The Supreme Court recently held that when a defendant's challenge to identification does not involve state action, "it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."  *Perry v. New Hampshire*, 132 S. Ct. 716, 720-21 (2012). The record shows that Murphy's counsel took advantage of these protections and also challenged Dashay's identification of photographs of Murphy in the hospital.

In sum, Murphy repeatedly attempted to discredit Dashay's identification of him.  The state court found that he had not pointed to any objective evidence of police misconduct or established that the identifications were improperly suggestive.  It also held that his challenges to Dashay's identification were speculative and thus properly presented to the jury via cross-examination.  Murphy does not contend that the trial court improperly limited his ability to cross-examine Dashay or any other witness.  In addition, he does not challenge the instructions

given to the jury about evaluating identification testimony, which track the factors in *Neil v. Biggers*, 409 U.S. at 199-200. *See* Dkt. 9-8 at PageID# 1613 (Ex. H at EE124).

Ultimately, Murphy's arguments about Dashay's identification reflect his belief that her identification should have been excluded because he did not think she was a credible witness. However, a habeas petitioner's subjective view of the evidence is not the relevant standard in a federal habeas corpus action. The court must consider whether the state court unreasonably determined any facts or unreasonably applied clearly established federal law to the facts. *See* 28 U.S.C. § 2254(d)(1). For the reasons discussed above, this court finds that the state courts' rulings about Dashay's identification testimony satisfy this standard. Thus, Murphy's due process identification claim fails.

## B.     Procedurally Barred Claims

With respect to the remaining claims, the court begins by considering procedural default and the full and fair presentment doctrine. It then turns to whether any exceptions to these procedural bars are available.

### 1.     Procedural Default – One Full Round (Claims B, E, F1, F2, F3 and G)

A petitioner must present his claims to all levels of the Illinois courts to avoid procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Thus, the court must determine if Murphy presented the claims in his federal habeas petition to the state trial court, the Illinois Appellate Court, and the Illinois Supreme Court. *See Castille v. Peoples*, 489 U.S. 346, 349 (1989) (failure to present claim to state intermediate court means it is procedurally barred); *O'Sullivan*, 526 U.S. at 844 (failure to present claim to state's highest court means it is procedurally barred); *see also Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004) (a

petitioner must "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings . . . . This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory.").

As illustrated by the following chart, Claims B, E, F1, F2, F3, and G are procedurally defaulted based on Murphy's failure to present these claims through one complete round of state court review (the trial court, the Illinois Appellate Court, and PLA with the Illinois Supreme Court) in either direct or state post-conviction proceedings:

| Claim # | Claim | Presented to State Court |
|---------|-------|--------------------------|
| B | Donny McGee's testimony about Officer Bartik | only presented in direct appeal |
| E | Police reports during jury deliberations | only presented in direct appeal and in the trial court post-conviction petition |
| F1 | Ineffective assistance of trial counsel: motion to suppress Dashay's identification | only presented in direct appeal |
| F2 | Ineffective assistance of trial counsel: failure to present testimony of alibi witnesses | only presented in the trial court post-conviction petition and in the post-conviction PLA (not the post-conviction appeal before the Illinois Appellate Court) |
| F3 | Ineffective assistance of trial counsel: failure to present alibi defense based on Murphy's confession | new claim; not presented to state court in direct or post-conviction proceedings |
| G | Failure to submit affidavits detailing testimony of alibi witnesses | only presented in post-conviction PLA |

Murphy may pursue these defaulted claims only if he can establish that an exception to procedural default applies. This issue is discussed below.

## 2. Full and Fair Presentment (Claim D)

The court next considers Murphy's claim that the trial court's denial of his motion for a mistrial based on the State's attempt to have Charmaine Dade testify that Dashay told her she remembered her attacker was named Lee violated his right to confront witnesses and his right to due process (Claim D). This claim is based on an interchange during Charmaine Dade's trial testimony. Dade testified that her grandchildren were watching a videotape of a memorial service for Choni. Dade testified as follows:

[Prosecutor]:   And what was on that video if you recall?

A:   They were showing the children at church.

Q:   And was that from [the recent] memorial service?

A:   Yes.

\* \* \* \*

Q:   Did Dashay or the children watch that more than once in your presence or just once?

A:   I went back in the room, and I went back in there, and they were watching it again.

Q:   And after they watched it again, what happened?

A:   I went back in the room, and then Dashay came in, and she said to me, granny, I remember the bad person's name.

Q:   What did you say?

A:   And I said what? And she said —

[Defense]:   I object to the hearsay.

| | |
|---|---|
| The Court: | The objection will be sustained. |
| [Prosecutor]: | Did she answer you? |
| A: | Yes. |
| Q: | Do you see the person she named in court today? |
| [Defense]: | Objection. |
| The Court: | Sustained. |

Dkt. 9-4, PageID #778-80 (Ex. D at AA242-44).

Murphy's counsel moved for a mistrial outside the presence of the jury, arguing that the State:

> attempted to elicit from the grandmother what Dashay had said, and that would be the testimony, "I remember the bad person's name." I objected, you sustained it. They immediately attempted to identify him in court as the person she named, and that was objected to and sustained also, but I believe that is a bell ringer for the Jury and totally unfair on the part of the Prosecutor, and I would ask for a mistrial.

Dkt. 9-5, PageID #813 (Ex. E at BB-3). The court denied the motion, stating that the defense's objections had been sustained and the testimony at issue had not been presented.

The respondent contends that Murphy did not properly exhaust Claim D because he did not fully and fairly present that claim to the state courts. Under the doctrine of full and fair presentment, a habeas petitioner must allow the state courts to consider his federal constitutional arguments in the first instance. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Thus, a petitioner must alert the state courts that his claims are based on the United States Constitution. *See id.*; *see also Anderson v. Harless*, 459 U.S. 4, 6

(1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.") (internal citations omitted).

Factors relevant to whether a habeas petitioner has fairly presented a claim to the state courts include whether his state court filings: (1) relied on federal cases that engage in constitutional analysis; (2) relied on state cases that apply a constitutional analysis to similar facts; (3) asserted a claim in terms that call to mind a specific constitutional right; or (4) alleged a pattern of facts "well within the mainstream of constitutional litigation." *Moleterno v. Nelson*, 114 F.3d 629, 634 (7th Cir. 1997). If none of these factors is present and the state challenges exhaustion, a claim will be defaulted under the full and fair presentment doctrine. "On the other hand, the presence of any one of these factors, particularly (1) and (2), does not automatically avoid a waiver." *Id.* (internal quotations omitted).

The court thus considers whether Murphy's state court filings about Dashay's statement to her grandmother presented his federal confrontation clause and due process claims to the state courts in a way that "raise[d] the red flag of constitutional breach.'" *Verdin v. O'Leary*, 972 F.2d 1467, 1475 (7th Cir. 1992) (quoting *Dougan v. Ponte*, 727 F.2d 199, 201 (1st Cir. 1984)). The court's review of the trial transcript does not show that during his trial, Murphy ever specifically objected to Charmaine Dade's reference to Dashay's statement on federal constitutional grounds. As a general rule, the "admissibility of evidence is generally a matter of state law." *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994); *see also United States ex rel. Byrd v. Welborn*, No. 92 C 0087, 1992 WL 293300, at *1 (N.D. Ill. Oct. 13, 1992) ("The question of the admissibility of the hearsay and other crimes evidence was a matter of state law, and will not

result in granting a habeas petition unless a federal constitutional right was violated or unless they rendered the trial fundamentally unfair.").

As Murphy is proceeding *pro se*, the court will construe the record in the light most favorable to him. Even if the court assumes that the state court should have understood that Murphy's motion for a mistrial was based on his federal constitutional right to confront witnesses because an objection to testimony based on the hearsay rule is "well within the mainstream of constitutional litigation," *Moleterno*, 114 F.3d at 634, the result is the same: any such claim would be unavailing. This is because, as the state court noted, the defense's objections during Charmaine Dade's testimony were sustained, and she did not testify that Dashay told her that "Lee" was the attacker.

Instead, this evidence came in because Murphy's counsel elicited Dashay's actual statement from Christine Escobar (the forensic services manager at the Chicago Children's Advocacy Center). Escobar testified immediately before Charmaine Dade. In the course of questioning her, Murphy's attorney affirmatively brought the issue up:

> [Defense]:     And in your 3-25 interview, [Dashay] repeatedly said I don't know his name, I don't know who he is, and I don't know his name, is that correct?
>
> A:     That's correct.
>
> Q:     When did you learn she blurted out the name Lee?
>
> A:     I don't believe I ever learned that.
>
> Q:     Well, would it surprise you to hear that she blurted out the name Lee?
>
> A:     No.
>
> [Prosecutor]:     Objection to the relevance.

| The Court: | Well, yeah, you're assuming a fact not in evidence. |
| [Defense]: | I beg your pardon? |
| The Court: | You're assuming a fact not in evidence. |
| [Prosecutor]: | Your Honor, we did not introduce that. |
| The Court: | I beg your pardon? |
| [Prosecutor]: | We did not introduce that into evidence. |
| The Court: | Okay.  Sustained. |

Dkt. 9-4, PageID #747-48 (Ex. D at AA211-12).  This colloquy is fatal to any confrontation clause claim as defense counsel, not the state, elicited the testimony about Dashay's statement to her grandmother.  To the extent that Murphy believes that this constitutes ineffective assistance of counsel, any such claim would be defaulted as Murphy did not present it through one complete round of state court review and, as discussed below, he has not established cause and prejudice for any of his defaulted claims.  Accordingly, even if the court assumes that Murphy fairly presented his claim about Dashay's statement to her grandmother (Claim D) in federal constitutional terms through one complete round of state court review, it is still unavailing.

### 3.    Exceptions to Procedural Default

Reading Murphy's *pro se* reply brief liberally, he appears to be asserting that:  (1) if he defaulted any claims, his default should be excused as he is proceeding *pro se* before this court and did not have the assistance of counsel at all stages of his state direct and collateral proceedings; (2) his state court counsels' failure to present his desired issues through one complete round of state court review means they provided constitutionally ineffective assistance; and (3) he received bad advice from jailhouse lawyers.  *See* Dkt. 10.

A federal court may not grant relief on a procedurally defaulted claim unless a petitioner can establish cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that the court's failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). As a general rule, cause exists where "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 282 n.24 (1999).

### a. Cause and Prejudice

Nothing in the record before the court indicates that an objective factor prevented Murphy from raising any of his defaulted claims properly. Moreover, the Seventh Circuit has "specifically rejected the argument that a petitioner's *pro se* status alone constitutes cause in a cause-and-prejudice analysis." *Smith v. McKee*, 598 F.3d 374, 385 (7th Cir. 2010) (collecting cases). This holding dooms Murphy's attempt to rely on his *pro se* status and his use of jailhouse lawyers.

The complex rules governing procedural default include specific standards governing whether cause excuses the default of ineffective assistance of trial counsel claims. Murphy's § 2254 petition contains three defaulted ineffective assistance of trial counsel claims. Specifically, Murphy asserts that his trial counsel was ineffective because he: (1) failed to contend that the lineup was suggestive as part of Murphy's motion to suppress Dashay's identification (Claim F1); (2) failed to investigate or call witnesses Brenda Evans, Raymond Wade, Anita Campbell, Darlene Edwards, and Teair Butler to provide alibi testimony (Claim

F2); and (3) failed to pursue an alibi defense based on Murphy's confession (Claim F3). Claim F2 appears in Murphy's *pro se* post-conviction petition but Claims F1 and F3 do not.

Murphy does not argue that the lack of counsel or ineffective counsel in his state post-conviction proceedings is cause that excuses his default of these three claims. Because he is proceeding *pro se*, the court will nevertheless consider if his position is bolstered by two recent Supreme Court cases: *Martinez v. Ryan*, — U.S. —, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, — U.S. —, 133 S. Ct. 1911 (2013). These cases establish limited circumstances where a petitioner who files a *pro se* state post-conviction petition can establish cause that excuses the default of ineffective assistance of trial counsel claims.

Under *Martinez*, cause may excuse a default if: "(1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law requires that an ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino*, 133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1318–19, 1320–21). *Trevino* clarified the fourth *Martinez* requirement by holding that if state law allows a defendant to present an ineffective assistance of trial counsel claim on direct appeal but that law "— as a matter of its structure, design, and operation — does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal," then the *Martinez* exception applies even if a defendant could have attempted to challenge trial counsel's effectiveness on direct appeal. *Id*. at 1921.

In Illinois, collateral proceedings are not the first opportunity to raise an ineffective assistance of counsel claim. *See People v. Miller*, 988 N.E.2d 1051, 1062 (Ill. App. Ct. 2013) (citing *People v. Banks*, 237 Ill.2d 154 (Ill. 2010)). Thus, numerous courts in this district have held that *Martinez* is inapplicable to federal habeas corpus petitions filed by Illinois prisoners. *See Turner v. Harrington*, No. 11 C 7771, 2013 WL 2296189, at *14 (N.D. Ill. May 24, 2013) (Dow, J.); *Weekly v. Hardy*, No. 11 C 9231, 2012 WL 3916269, at *5 (N.D. Ill. Sept. 6, 2012) (Der–Yeghiayan, J.); *Butler v. Hardy*, No. 11 C 4840, 2012 WL 3643924, *3 (N.D. Ill. Aug. 22, 2012) (Kendall, J.); *Gill v. Atchison*, No. 11 C 7868, 2012 WL 2597873, at *6 (N.D. Ill. Jul. 2, 2012) (Holderman, J.); *Blair v. Rednour*, No. 11 C 4108, 2012 WL 1280831, at *4 (N.D. Ill. Apr. 11, 2012) (Gettleman, J.).

With respect to *Trevino*, "[u]nder Illinois law a petitioner can adequately develop the factual record supporting his ineffective assistance of counsel claim prior to his direct appeal by filing post-trial motions pursuant to the Illinois Supreme Court's decision in *People v. Krankel*, 102 Ill.2d 181 (Ill. 1984) (holding that a defendant is entitled to new counsel to represent him on post-trial motions alleging ineffective assistance of trial counsel)." *Butler*, 2012 WL 3643924 at *3. In contrast, *Trevino* turned on Texas law, under which it is "virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim" on direct review. *Trevino*, 133 S. Ct. at 1918 (quoting *Robinson v. State*, 16 S.W.3d 808, 810-11 (Tex. Crim. App. 2000)). Because of this critical difference between Illinois and Texas law, *Trevino* does not apply to this case, as Murphy had a meaningful chance to raise an ineffective assistance of trial counsel claim in his direct proceedings, had he chosen to do so. *See id*. at 1921. Thus, neither *Martinez* nor *Trevino* constitute cause that excuses Murphy's procedural

default of his ineffective assistance of trial counsel claims. Because Murphy cannot establish cause for any of his defaulted claims, the court will not address prejudice. *Promotor*, 628 F.3d at 887.

In the interests of completeness, the court also adds that *Martinez* and *Trevino* are inapplicable for additional reasons. First, Claims F1 and F3 do not raise substantial constitutional issues. *See Martinez*, 132 S. Ct. at 1318–19, 1320–21; *see also Trevino*, 133 S. Ct. at 1918. Murphy's contention that his trial counsel was ineffective because he failed to contend that the lineup was suggestive when he moved to suppress Dashay's identification (Claim F1) largely overlaps with Murphy's due process challenge to Dashay's identification in Claim C, which the court has already rejected on the merits.

In Claim F3, Murphy asserts that his trial counsel was ineffective because he failed to pursue an alibi defense based on Murphy's statement to Detective McNally. According to Murphy, he was with alibi witnesses on the day that Choni and her children were attacked. To receive habeas relief on this claim, Murphy must establish that his counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–91 (1984). If a defendant fails to satisfy one of the prongs, the court's inquiry under *Strickland* ends. *See id.* at 697.

When the court considers the proposed alibi defense against the backdrop of the complete trial court record, which is discussed above in connection with Murphy's sufficiency of the evidence claim, it is clear that any alibi defense would have been unavailing. As the Illinois Appellate Court found on post-conviction review, potential alibi witnesses Anita Campbell,

Raymond Wade, and Wade's mother all had "close relationship[s]" with Murphy so their testimony could have created significant problems. Wade was Murphy's friend and Campbell, (whom Murphy had also accused of the crime) was his fiancée. Moreover, if counsel had called Darlene Edwards and Teair Butler, as Murphy now suggests, their testimony that Murphy was with them could have been used to impeach Murphy's testimony that he was with Wade. *See People v. Murphy*, No. 1-09-2411, at 2-9 (Dkt. 9-18, Page ID# 2553-2560). Thus, counsel's decision not to present an alibi defense could not have been prejudicial.

Finally, Murphy included Claim F2 in his *pro se* post-conviction petition and his appellate court brief but failed to include the claim in his PLA. He is not entitled to take advantage of *Martinez* and *Trevino* because he did not default Claim F2 due to the lack of counsel during his initial-review collateral proceedings. *See United States ex rel. Fleming v. Chandler*, No. 12 C 5190, 2013 WL 589559, at *5 (N.D. Ill. Feb. 14, 2013) ( "*Martinez* does not apply to procedural defaults based on omissions during the [post-conviction] appellate process.").

### b. Fundamental Miscarriage of Justice

The court next turns to the fundamental miscarriage of justice exception, which applies in "situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002), *citing Schlup v. Delo*, 513 U.S. 298, 327 (1995). To show "actual innocence," a petitioner must present clear and convincing evidence that, but for the alleged constitutional error, no reasonable juror would have convicted him. *Id*. To satisfy this demanding standard, Murphy "must support the innocence claim with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence — that was not presented at trial." *Morales v.*

*Johnson*, 659 F.3d 588, 606 (7th Cir. 2011) (internal quotations omitted).

Murphy's § 2254 petition, as well as his state court pleadings, reflect his belief that the

jury should have rejected Dashay's identification testimony. He does not point to any new

evidence (indeed, he does not address the fundamental miscarriage of justice exception at all; the

court is reaching this issue only because Murphy is proceeding *pro se*). Moreover, a claim of

actual innocence based on a challenge to the credibility of witnesses who testified at trial is

insufficient to establish a fundamental miscarriage of justice. *See Araujo v. Chandler*, 435 F.3d

678, 681-82 (7th Cir. 2005). Thus, this exception does not apply and Murphy is not entitled to

habeas relief.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, which provides that the

district court must issue or deny a certificate of appealability when it enters "a final order

adverse to the applicant," the court turns to whether a certificate of appealability should issue.

Under 28 U.S.C. § 2253(c)(2), "(1) [a] certificate of appealability may be issued only if the

prisoner has at least one substantial constitutional question for appeal; (2) [t]he certificate must

identify each substantial constitutional question; (3) [i]f there is a substantial constitutional issue,

and an antecedent non-constitutional issue independently is substantial, then the certificate may

include that issue as well; (4) [a]ny substantial non-constitutional issue must be identified

specifically in the certificate; [and] (5) [i]f success on a non-constitutional issue is essential

(compliance with the statute of limitations is a good example), and there is no substantial

argument that the district judge erred in resolving the non-constitutional question, then no

certificate of appealability should issue even if the constitutional question standing alone would have justified an appeal." *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003).

For the reasons discussed above, the court finds that Murphy "deserves encouragement to proceed further" on Claim C and certifies the following issue for appeal: whether the admission of Dashay's line-up and in-court identifications violated his right to due process. *See Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). With respect to the remainder of his claims, he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently." *See id*. Accordingly, the court declines to issue a certificate of appealability as to any other claims.

## IV. CONCLUSION

For the above reasons, Murphy's request for a writ of habeas corpus under 28 U.S.C. § 2254 is denied. The court certifies the following issue for appeal under 28 U.S.C. § 2253(c): whether the admission of Dashay's line-up and in-court identifications violated Murphy's right to due process. The clerk is directed to substitute Rick Harrington as the respondent and enter a Rule 58 judgment terminating this case.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  August 19, 2013